UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Sr. M. Regina Fahy, RSM;
Haliyamtu Theo Amani;
Sarra Ali; Eva Castillo-Turgeon;
and Annagreta Swanson,
     Plaintiffs

     v.                                  Civil No. 05-cv-97-SM
                                         Opinion No. 2006 DNH 038
Commissioner, New Hampshire
Department of Safety,

**O R D E R**

Plaintiffs are New Hampshire residents who are lawfully in this country, but are not citizens of the United States. They bring this action seeking a judicial declaration that certain written and unwritten policies of the New Hampshire Department of Safety, Division of Motor Vehicles (the "DMV"), discriminate against non-citizens in violation of their constitutionally protected rights.

Pending before the court are plaintiffs' motion for preliminary and permanent injunctive relief, defendant's motion for partial dismissal, and the parties' cross-motions for summary judgment.

**Standard of Review**

To be entitled to permanent injunctive relief, plaintiffs must demonstrate that: (1) they prevail on the merits of their claims; (2) they would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs in the absence of injunctive relief outweighs any harm to the State if an injunction issues; and (4) the public interest would not be adversely affected by the issuance of an injunction.  See A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 5 (1st Cir. 1997).

Additionally, because plaintiffs have moved for summary judgment, they must also demonstrate that the record reveals "no genuine issue as to any material fact and . . . [that they are] entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  Intern'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

2

**Factual Background**

I.   The Plaintiffs.

Plaintiff Sister M. Regina Fahy ("Fahy") is a citizen of the Republic of Ireland.  She resides in Manchester, New Hampshire. She is a legal permanent resident and has lived in New Hampshire continuously since 1975.  She has had a New Hampshire driver's license since 1980.  Until April of 2004, Sister Fahy routinely renewed her license at the Manchester DMV substation.  When she went to renew her license in April of 2004, she was told she would have to go to the DMV's main office in Concord because she is a non-citizen.  Sister Fahy went to Concord the next day with her then-current driver's license and her social security card, but says she was told by the person at the non-citizens' window that the documentation she provided was not sufficient.

Eventually, on her third attempt to renew her license, Sister Fahy was successful.  She paid a $50.00 fee and was given a yellow, handwritten, 45-day temporary permit with no picture. Sister Fahy says she found both the process and the temporary permit to be personally embarrassing and humiliating.  As a result, she chose not to drive until she received her standard,

3

laminated license in the mail.  When she did receive her standard driver's license, she discovered that rather than being valid for the statutorily prescribed five-year term, it expired in two years and nine months.  The State says the expiration of Sister Fahy's license coincides with the expiration date on the immigration documentation she provided to DMV employees – that is, the license period was coextensive with her apparent authorized stay in this country.  Sister Fahy's current driver's license does not have a blue bar beneath her picture.[1]

Plaintiff Haliyamtu Theo Amani ("Amani") is a citizen of the Democratic Republic of the Congo and, like Sister Fahy, resides in Manchester.  Amani arrived in New Hampshire in 1990 and was granted refugee status in 1997.  He obtained his first New Hampshire driver's license at the Manchester DMV substation and, until April of 2002, he was able to renew it there.  When Amani went to Manchester in April of 2002 to renew again, he saw a sign directing all non-citizens to Concord.  That same day, he went to

---

[1]     A blue bar appears beneath the photo of any driver who has been issued a duplicate license.  Several plaintiffs, however, have a blue bar beneath their photos, even though they have not been issued a duplicate license.  Those plaintiffs are concerned that the blue bar somehow indicates their immigration status.

4

Concord and was directed to a line for non-citizens.  Upon
reaching the window, he discovered that in addition to being
required to prove his identity and citizenship status, he was
also required to show proof of residency.  Amani returned to
Concord another day with the appropriate documents and was given
a yellow, handwritten, temporary driver's permit with no picture.
When he asked why he had been issued a temporary permit, he says
he was told that the DMV had to investigate all non-citizens.

Since April of 2002, Amani has been required to renew his
driver's license every year.  According to the State, this is
because Amani's visa indicates that he was admitted to this
country as a refugee, for an indefinite period of time.  And, at
least until recently, the State required non-citizens with
"indefinite" status to renew their licenses annually.[2]  Each time
he has renewed his license, Amani says he has been required to
present documents proving his identity, immigration status, and
New Hampshire residency.  Each time, he says, he has received a

_____

[2]     That practice has, however, stopped.  Now, the State
issues a five-year driver's license to any non-citizen resident
with "indefinite" status.  See Exh. C-1 to defendant's memorandum
(document no. 40), "Clarification of the Pilot Program" (April
27, 2005).

5

yellow 45-day temporary permit and only later received a standard driver's license, albeit one that expired in ten and one-half months.

Although he has never requested a duplicate license, Amani's license bears a blue bar below his photograph.  The State explains that this is because with each annual renewal of his license, Amani was charged only $10, rather than the typical $50 renewal fee.  In essence, says the State, his renewal was processed (and he was charged) as if it were for a duplicate license.  The benefit to Amani is plain: he was charged a far lower fee.  But, because his application was routinely treated as one for a duplicate license, the system employed by the DMV produced it with the blue bar that is displayed on all duplicate licenses.

Plaintiff Sara Ali ("Ali") is a citizen of Sudan and was granted asylum in the United States in 2002.  She, too, resides in Manchester.  Ali first attempted to obtain an original New Hampshire driver's license in January of 2003.  DMV personnel told Ali that in order to prove residency, she would have to

produce utility bills in her name, a social security number, a
letter from her employer, and a car registered in her name.  She
apparently produced the requisite documentation and, after two
unsuccessful attempts, Ali passed the practical driving test on
March 19, 2003.  She was given a yellow, handwritten, 45-day
temporary permit with no picture.

Eventually, Ali's standard, laminated license came in the
mail.  But, that license was scheduled to expire less than nine
months after it was issued.  And, she says that when she renewed
that license, the new one expired less than four months after it
was issued.  Her current license is valid for a period of one
year.  Each time Ali has renewed her driver's license, she has
been issued a yellow 45-day temporary driver's permit.  Although
she has never requested a duplicate license, her current license
(as well as the previous one) bears the blue bar beneath her
photograph.

According to the State, Ali's initial licenses were issued
with a one-year expiration date because the documentation she
presented in support of each renewal application was a work

authorization card, which was valid for only one year.  Her
driver's license expiration date was, therefore, linked to that
date.  But, when she eventually presented documentation that she
had been granted indefinite asylum status, the State says her
driver's license expiration date was extended to the customary
five years from the date on which she originally paid the full
$50 licensing fee.  Because a new license had to be issued
(including, among other things, a new expiration date), she was
charged the $10 "duplicate license" fee and, accordingly, her
license bears the blue bar at the bottom.

     Plaintiff Eva Castillo-Turgeon ("Castillo-Turgeon") is a
citizen of Venezuela and is a legal permanent resident who has
lived in the United States for several years, most recently
returning with her U.S.-born husband and children in 1999.  She
has resided in New Hampshire since 2000 and currently lives in
Manchester.  Castillo-Turgeon applied for her original driver's
license at the Manchester DMV in May of 2001 and was issued a
license that expired in November of 2001 (when her work permit
expired).  When she returned to Manchester to renew her license

8

in November of 2001, Castillo-Turgeon was told she would have to go to Concord.

In Concord, Castillo-Turgeon was directed to a line for non-citizens and was able to renew without being required to show proof of identity, immigration status, or residency.  She was issued a license that expired in four years.  Although she has never requested a duplicate license, her license bears the blue bar beneath her photograph.  The State says that, as was the case with other plaintiffs, when Castillo-Turgeon returned to the DMV to renew her license, she was credited with having paid the full $50 license fee in May of 2001, she was issued a new license that expired five years from that date (i.e., May, 2006), and she was charged only the $10 "duplicate license" fee (which, again, explains the blue bar on her license).

Plaintiff Annagretta Swanson ("Swanson") is a citizen of Germany and is a legal permanent resident who has lived in the United States continuously since 1965.  She currently lives in Peterborough, New Hampshire.  Swanson has had a New Hampshire driver's license since 1973.  In November of 2001, she attempted

to renew her license at the Milford DMV substation, where she was told that she would have to go to Concord.  That day, Swanson drove to Concord and was directed to the non-citizen line where, after providing the appropriate documents, she was given a yellow 45-day temporary permit.  Swanson says she asked the DMV employee why she did not receive the standard New Hampshire driver's license and claims that he told her, in a voice loud enough to be overheard by many other people, that she was "under investigation" - a remark that caused Swanson to feel personally embarrassed and humiliated.

Swanson received her standard, laminated driver's license in the mail.  It expired on January 8, 2006, and, since she paid the full licensing fee, her license did not have a blue bar beneath her picture.

II. <u>Challenged State Practices</u>.

Plaintiffs challenge both written and unwritten practices of the DMV that they claim unconstitutionally discriminate against them as non-citizens.  Specifically, they seek temporary and

permanent injunctive relief against the State, prohibiting it from enforcing the following policies:

1.  The regulatory requirement set forth in Saf-C 1002.06(b) which provides that "all non-United States citizens applying for an original or renewal driver license shall appear only at the Division of Motor Vehicles [in] Concord, N.H."

2.  The requirement that all non-citizen applicants for an original driver's license take a road skills test, even if they are surrendering a valid driver's license from another state, while similarly situated citizens of the United States need only take such a test under limited circumstances. Saf-C 1003.04(a)(3).

3.  The requirement that, if a non-citizen does not hold a driver's license from his or her home country, he or she must provide documentation <u>from the home country</u> that demonstrates either: (a) the applicant has never held a driver's license; or (b) that the applicant has held a driver's license in the United States.  Saf-C 1003.04(c).

4.  The practice of issuing a 45-day paper driving permit to non-citizen applicants for original driver's licenses, when citizens receive a 6-month laminated photo-I.D. temporary license.  Saf-C 1003.04(e)

5.  An allegedly unwritten policy of requiring non-citizens to renew their driver's licenses more frequently than the statutorily required five (5) years.

    6.   An allegedly unwritten policy imposing on
         non-citizens more onerous requirements
         regarding proof of N.H. residency, even when
         they are merely renewing an existing N.H.
         driver's license.

III. <u>The State Regulations</u>.

    The New Hampshire Department of Safety, Division of Motor

Vehicles, has enacted administrative rules which include

licensing requirements for non-United States citizens ("non-

citizens").   In September of 2001, the DMV began requiring non-

citizens to go to Concord to obtain and renew their driver's

licenses.   And, as part of that program, it assigned two document

examiners, each of whom has foreign language expertise and

additional training in document identification, to the non-

citizen post in Concord.   The DMV rules pertaining to non-

citizens were formalized in 2004.


    One of the challenged administrative regulations – Saf–C

1002.06(b) – requires all non-citizens applying for either an

original or a renewal driver's license to appear at the Concord

DMV office.   And, Saf–C 1003.04(a) requires non-citizens applying

for an original driver's license to complete a road skills test,

even if they hold (and are surrendering) a valid driver's license

12

from another state.  Citizens of the United States in a similar
position need not complete a road skills test.

If an applicant presents a driver's license from his or her
home country, Saf-C 1003.04(b) requires the Director to assess
whether the license is genuine, whether it was actually issued to
the applicant, and whether it is under suspension or revocation.
If an applicant does not possess a license from his or her home
country, Saf-C 1003.04(c) requires him or her to provide
verification from the home country that he or she (1) has never
held a driver's license; or (2) has held a driver's license in
the United States – documentation that plaintiffs say is
virtually impossible to obtain since, presumably, few countries
actually keep such records relating to citizens living abroad.

The administrative regulations further provide that a 45-day
temporary permit shall be issued to non-citizen applicants upon
receipt of the necessary forms and materials.  Saf-C 1003.04(e).
And, Saf-C 1003.04(g) provides that driver's licenses shall be
valid for up to 5 years or until the date the applicant's visa,

I-20 form, DS-2019 form, or employment status expires, whichever occurs first.

In January of 2005, the DMV began a "pilot program" which permits any permanent resident, refugee, or asylee with indefinite status, who has completed one original or one renewal application in Concord, to renew a driver's license at any DMV substation.  That pilot program was clarified or supplemented on April 27, 2005, when the Supervisor of the Bureau of Driver Licensing issued a memo to all DMV employees.  Attachment 1 to Haynes Aff., Def.'s Ex. F.[3]

Currently, then, the DMV administrative regulations, as amended and supplemented by the provisions of the "pilot program," provide that:

> 1.    Any permanent resident, refugee, or asylee seeking to renew a driver's license that was originally issued <u>before</u> September 11, 2001,

---

[3]    The State has committed to permanently enforce the provisions of the "pilot program" and, for that reason, says it should not be regarded as either a temporary or experimental program.  <u>See</u> Exh. O to defendant's memorandum, testimony of Virginia Beecher before the Joint Legislative Committee on Administrative Rules.  <u>See also</u> Exh. X to defendant's memorandum (proposed amendments to DMV administrative regulations).

must do so at the Driver Licensing Office in
Concord.  Any subsequent renewals, however,
may be done at any Driver Licensing office.

2.    Any permanent resident, refugee, or asylee
who was issued an original or renewal license
<u>after</u> September 11, 2001, may renew that
license at any Driver Licensing Office; there
is no longer any requirement that the
applicant appear exclusively in Concord.

3.    There is no longer any requirement that non-
citizen applicants for renewal licenses prove
their residency, unless there is some reason
to believe that there has been a change in
residence.

4.    Non-citizens who apply for renewal licenses
are no longer issued temporary 45-day
licenses, though those temporary licenses are
still issued to non-citizen applicants
seeking an original driver's license.

5.    The expiration date for all non-citizens'
driver's licenses are linked to the
expiration date of the legal status documents
they provide when they file their application
for an original or renewal license.  For
licenses that must bear an expiration date
sooner than the typical five years, recent
legislation authorizes the DMV to pro-rate
the $50 statutory fee.

6.    If the applicant has an "indefinite" status,
he or she will receive a 5-year driver's
license.

7.    Non-citizens who are in the United States on
a temporary basis must continue to apply for
original and renewal driver's licenses in
Concord.

Among other things, plaintiffs allege that the State's classification by citizenship violates their rights to equal protection of the laws.  They request preliminary and permanent injunctive relief barring the enforcement of Saf-C 1002.06, 1003.04, and the uncodified policies they say are being enforced by the DMV.  They also seek attorneys' fees, costs, and expenses pursuant to 42 U.S.C. §1988.

The State says plaintiffs' equal protection rights have not been violated because: (1) plaintiffs are not similarly situated in all relevant respects to all other driver's license applicants; (2) even if they are similarly situated, recent congressional enactment of The Real ID Act, Pub.L. 109-13 Div. B, Title II, §§ 201-207 (May 11, 2005)("Improved Security for Drivers' Licenses and Personal Identification Cards"), requires that any alleged equal protection violation be analyzed under the lenient "rational basis" standard of review – a test which the State says its regulations easily pass; and (3) even if the more rigorous "strict scrutiny" test applies, the challenged regulations and policies survive that standard as well.

16

**Discussion**

I.   <u>Plaintiffs' Standing</u>.

As an initial matter, the State asserts that plaintiffs lack standing to assert the claims advanced in their complaint.  The Court of Appeals for the First Circuit has observed that

> Standing involves both constitutional imperatives and prudential considerations.  An inquiry into standing must be based on the facts as they existed when the action was commenced.
>
> To satisfy Article III's "personal stake" requirement vis-a-vis a statutory challenge, the plaintiff bears the burden of demonstrating that (i) she has suffered an actual or threatened injury in fact, which is (ii) fairly traceable to the statute, and (iii) can be redressed by a favorable decision.  Allegations of abstract injury are insufficient to make out an injury in fact.  Instead, the plaintiff "must show that he has sustained or is immediately in danger of sustaining some direct injury."

<u>Ramirez v. Sanchez Ramos</u>, 438 F.3d 92, 97 (1st Cir. 2006) (citations omitted).  The court went on to note that, "[i]n general – there are exceptions, but we need not discuss them here – prudential concerns require a plaintiff to show that she is seeking to protect her own legal rights (rather than those of a third party), that her complaint does not merely represent a

generalized grievance, and that the complaint falls within the

zone of interests protected by the law invoked." <u>Id</u>. at 98.


In this case, none of the plaintiffs alleges that he or she

was required take a road skills test despite the fact that he or

she surrendered a valid driver's license from another state.  <u>See</u>

Saf-C 1003.04(a)(3).  Nor does any plaintiff allege that he or

she was required to provide documentation from his or her home

country attesting to the fact that either: (1) the applicant

never held a driver's license in that country; or (2) the

applicant has held a driver's license issued by another state.

<u>See</u> Saf-C 1003.04(c).  Consequently, none of the plaintiffs has

standing to challenge those two administrative rules.[4]


As to plaintiffs' remaining claims, however, it is clear

that they do have standing.  For example, several plaintiffs have

---

[4]     As an aside, the court notes that the record suggests
that the State is not enforcing the former of those
administrative requirements against non-citizens.  That is to
say, those who surrender a driver's license from another state
are not required to take a road skills test.  <u>See, e.g.</u>,
Defendant's memorandum in support of summary judgment (document
no. 40) at 5 ("Non-U.S. citizens that present a valid driver
license from out of state are treated the same as citizens in
regards to any requirement that a road test be taken.")
(citations omitted).

testified in affidavits that they were required to drive to the DMV main office in Concord to process license renewals, as required by Saf-C 1002.06(b).  Similarly, Sister Fahy and Amani both testified that, when they sought to renew their expired New Hampshire driver's licenses, they were issued 45-day paper driving permits.  <u>See</u> Saf-C 1003.04(e).  And, Ali testified that when she applied for an original driver's license, she too was initially given a 45-day paper driving permit.  Finally, plaintiffs have adequately alleged that they were required to renew their driver's licenses more frequently than the five-year statutory period, and that they were subjected to onerous requirements regarding proof of residency, even when they were simply renewing an expired New Hampshire driver's license.  As to those claims, then, plaintiffs plainly have standing.

II.  <u>Mootness of Plaintiff's Claims</u>.

Next, the State asserts that, in light of the changes made to licensing procedures applicable to non-citizens, plaintiffs' claims have been rendered moot.  Plaintiffs, on the other hand, point out that, while the State's decision to voluntarily stop its arguably unconstitutional practices is certainly a factor to

be considered, it does not, standing alone, automatically render plaintiffs' claim moot.  The court agrees.  As the Supreme Court has noted:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982).  In support of their view that the court should consider their claims on the merits and issue appropriate injunctive relief, plaintiffs point out that the recently-adopted policies of the State have not been uniformly adopted and/or applied at the various DMV substations.

> [Plaintiffs'] experiences [in attempting to renew their driver's license] demonstrate exactly the opposite of what the Commissioner contends:
>
> **Sara Ali:** Ali renewed her license in April, 2005, in Manchester.  She received a license good for only three years, not the five required by RSA 263:10 for adult citizens.
>
> **Theo Amani:** Amani renewed his license in April, 2005, in Manchester.  He was once again required to produce

his immigration papers, despite his protest that they
were already in the DMV file.

**Annagreta Swanson:** Swanson tried to renew her license
on November 15, 2005.  Because her alien registration
card was due to expire in January, 2006, the DMV
refused to issue a renewal license valid for any longer
than two months.  This despite the Commissioner's
assertion that, under the pilot program, aliens of
indefinite duration status would be issued five-year
licenses.  Swanson was finally issued a five-year
renewal license only after she renewed her "green
card."

**Eva Castillo-Turgeon:** Castillo-Turgeon renewed her
license on November 4, 2005.  The DMV personnel
demanded to see her immigration documents.

Plaintiffs' memorandum in opposition to summary judgment

(document no. 43) at 22 (citations omitted).


Given the apparent inconsistency with which DMV personnel

have been applying the revised licensing procedures applicable to

non-citizens, the court concludes that it is appropriate and

would be beneficial to address plaintiffs' claims on the merits

and clarify the respective constitutional rights and obligations

of the parties.


III.  Equal Protection.

The Equal Protection Clause of the Fourteenth Amendment

provides that "[no] State [shall] deprive any person of life,

21

liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court has interpreted this clause to require that "all persons similarly circumstanced shall be treated alike." Plyler v. Doe, 457 U.S. 202, 216 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)).

It is well settled that aliens, even those whose presence in this country is unlawful, are "persons" entitled to equal protection and due process of law under the Fifth and Fourteenth Amendments.  Plyler, 457 U.S. at 202.  The Plyler Court ruled that a Texas law restricting enrollment in public school to children of U.S. citizenship violated the equal protection rights of undocumented school-aged children.  In so holding, the Court noted that:

> The term "person," used in the Fifth Amendment, is broad enough to include any and every human being within the jurisdiction of the republic.  A resident, alien born, is entitled to the same protection under the laws that a citizen is entitled to.  He owes obedience to the laws of the country in which he is domiciled, and, as a consequence, he is entitled to the equal protection of those laws.

Plyler, 457 U.S. at 213 (quoting Wong Wing v. United States, 163
U.S. 228, 242 (1896) (Field, J., concurring)).


    While acknowledging that plaintiffs are entitled to the
protections afforded by the Due Process Clause of the Fourteenth
Amendment, the State argues that non-citizens are not similarly
situated to U.S. citizens when it comes to driver's licenses.
Among other things, the State says this is because non-citizens
"have a plethora of different documents to demonstrate their
status that are different than what must be processed for a
citizen."  Defendant's memorandum (document no. 11) at 17.  The
State also points to communication and accommodation barriers
which contribute to substantial differences in processing license
applications filed by non-citizens (though plainly communication
and accommodation barriers are not issues uniquely presented by
non-citizens; some United States citizens from Puerto Rico or
citizens who were recently naturalized, for example, might have
difficulty communicating in English).


    In analyzing an equal protection claim, the Court must
"determine the proper standard under which to review the

classification and then analyze the purpose of the legislation to determine whether it satisfies the standard." Richard v. Hinson, 70 F.3d 415, 417 (5th Cir. 1995) (citing United States R. Retirement Bd. v. Fritz, 449 U.S. 166, 174 (1980)).  The two traditional tests used are "strict scrutiny" and "rational basis."

Typically, if a legislative classification violates a fundamental right or has the effect of impairing members of a suspect class, then the court must apply strict scrutiny.  Id. (citing San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1 (1973)).  For legislation to be held constitutional under the strict scrutiny test, the government bears the substantial burden of proving that its classification is both "narrowly tailored" and designed to further a "compelling governmental interest." Johnson v. California, 125 S. Ct. 1141, 1146 (2005).

If, on the other hand, the legislative classification does not disadvantage a suspect class or violate a fundamental right, the State need only demonstrate that the legislative classification "bears a rational relationship to the furtherance

24

of a legitimate governmental purpose." <u>Gary S. v. Manchester</u>
<u>Sch. Dist.</u>, 374 F.3d 15, 22 (1st Cir. 2004) (citing <u>Reagan v.</u>
<u>Taxation with Representation of Washington</u>, 461 U.S. 540, 547
(1983)).  There is a strong presumption of validity when a
statute is analyzed under rational basis review.  As the Supreme
Court has explained:

>     [R]ational basis review in equal protection analysis is
>     not a license for courts to judge the wisdom, fairness
>     or logic of legislative choices.  Nor does it authorize
>     the judiciary to sit as a superlegislature to judge the
>     wisdom or desirability of legislative policy
>     determinations made in areas that neither affect
>     fundamental rights nor proceed along suspect lines. . .
>     Such a classification cannot run afoul of the Equal
>     Protection Clause if there is a rational relationship
>     between the disparity of treatment and some legitimate
>     governmental purpose.  Further, a legislature that
>     creates these categories need not actually articulate
>     at any time the purpose or rationale supporting its
>     classification.  Instead, a classification must be
>     upheld against equal protection challenge if there is
>     any reasonably conceivable state of facts that could
>     provide a rational basis for the classification.

<u>Heller v. Doe</u>, 509 U.S. 312, 319-320 (1993) (internal quotations
and citations omitted).

     Plaintiffs argue that strict scrutiny review must be applied
to all of the challenged DMV regulations and uncodified policies

because resident aliens constitute a suspect classification.
They also assert that strict scrutiny must be applied because,
among other things, the challenged DMV rules violate plaintiffs'
fundamental right to equal protection.  The State disagrees,
asserting that due to the recent enactment of federal law on the
subject – The Real ID Act – the challenged DMV rules are subject
only to rational basis review.  In the alternative, the State
insists that the regulations survive even strict scrutiny review.

At this juncture, it is probably appropriate to note the
scope of the authority possessed by the states to enact laws and
administrative regulations that treat citizens and non-citizens
differently, as contrasted with the broader authority possessed
by Congress in that area.  First, the Supreme Court has
consistently recognized the predominant authority of the federal
government to regulate aliens within the United States.  Toll v.
Moreno, 458 U.S. 1, 10 (1982).  Congress derives its power from
"the Federal Government's power to establish a uniform Rule of
Naturalization, U.S. Const., Art. I, § 8, cl. 4, its power to
regulate Commerce with foreign Nations, id., cl. 3., and its
broad authority over foreign affairs."  Toll, 458 U.S. at 10

(internal quotations and punctuation omitted).  And, based on its
broad power over immigration and naturalization, Congress has the
authority to treat aliens differently from citizens.  The fact
that Congress chooses to exercise that power does not alone
qualify such disparate treatment as "invidious."  <u>Mathews v.
Diaz</u>, 426 U.S. 67, 78 (1976) (provision of Social Security Act
that grants Medicare benefits to certain resident citizens over
65, but not to aliens over 65 unless they have been permanent
residents of the U.S. for a minimum of five years does not
violate Equal Protection Clause).  The Court explained that
"[t]he fact that all persons, aliens and citizens alike, are
protected by the Due Process Clause does not lead to the further
conclusion that all aliens are entitled to enjoy all the
advantages of citizenship or, indeed, to the conclusion that all
aliens must be placed in a single homogeneous legal
classification."  <u>Id</u>.

    With regard to the authority possessed by the states, the
Court has also long recognized substantial limitations on the
authority of the states to make similar classifications.  So, for
example, in <u>Takahashi v. Fish & Game Com'n</u>, 334 U.S. 410 (1948),

the Supreme Court declared unconstitutional a California statute

that precluded aliens who were ineligible for U.S. citizenship

from obtaining commercial fishing licenses.  California attempted

to defend the statute by arguing that it had "simply followed the

Federal Government's lead in adopting that classification from

the naturalization laws."  Id. at 418).  The Court rejected that

argument, noting:

> The Federal Government has broad constitutional powers
> in determining what aliens shall be admitted to the
> United States, the period they may remain, regulation
> of their conduct before naturalization, and the terms
> and conditions of their naturalization.  Under the
> Constitution the states are granted no such powers;
> they can neither add to nor take away from the
> conditions lawfully imposed by Congress upon admission,
> naturalization and residence of aliens in the United
> States or the several states.  State laws which impose
> discriminatory burdens upon the entrance or residence
> of aliens lawfully within the United States conflict
> with this constitutionally derived federal power to
> regulate immigration, and have accordingly been held
> invalid.

Takahashi, 334 U.S. at 419 (citation and footnote omitted)

(quoted in Toll, 458 U.S. at 11) (emphasis omitted).


Following Takahashi, the Supreme Court took the equal

protection analysis a step further, establishing the general rule

28

that state "classifications based on alienage, like those based

on nationality or race, are inherently suspect and subject to

close judicial scrutiny."  <u>Graham v. Richardson</u>, 403 U.S. 365,

372 (1971) (Pennsylvania statute denying resident aliens welfare

benefits and Arizona statute denying welfare benefits to resident

aliens living in U.S. less than fifteen years both violate Equal

Protection Clause).  The Court explained that "[a]liens as a

class are a prime example of a 'discrete and insular' minority

for whom such heightened judicial solicitude is appropriate."

<u>Id</u>. (citation omitted).

Since <u>Graham</u>, the Court has been consistent in applying

strict scrutiny to state laws creating classifications by

alienage.  <u>Soskin v. Reinertson</u>, 353 F.3d 1242, 1250 (10th Cir.

2004).  <u>See, e.g.</u>, <u>Bernal v. Fainter</u>, 467 U.S. 216, 219–220

(1984) (Texas law requiring U.S. citizenship for state notaries

public subject to strict scrutiny); <u>Examining Bd. v. Flores de

Otero</u>, 426 U.S. 572, 601–602 (1976) (same for Puerto Rico law

requiring U.S. citizenship to obtain engineer license); <u>In re

Griffiths</u>, 413 U.S. 717, 721 (1973) (same for Connecticut law

requiring U.S. citizenship for membership in State Bar); <u>Sugarman</u>

29

<u>v. Dougall</u>, 413 U.S. 634, 642 (1973) (same for New York law requiring U.S. citizenship for competitive state civil service positions).

Importantly, however, in <u>De Canas v. Bica</u>, 424 U.S. 351 (1976), the Court upheld a section of the California Labor Code, which prohibited California employers from knowingly employing illegal aliens when that employment would adversely affect resident workers.  The Court found that the statute was not invalid under the Supremacy Clause because Congress had not "unmistakably ordained" exclusive federal regulation in the field of employment of illegal aliens; on the contrary, the Court held that amendments to the Farm Labor Contractor Registration Act were evidence that "Congress intends that States may, to the extent consistent with federal law, regulate the employment of illegal aliens." <u>Id</u>. at 361.  The Court reiterated this principle in <u>Plyler</u>, holding that when:

> [f]aced with an equal protection challenge respecting
> the treatment of aliens, we agree that the courts must
> be attentive to congressional policy; the exercise of
> congressional power might well affect the State's
> prerogatives to afford differential treatment to a
> particular class of aliens. . . . [T]he States do have
> some authority to act with respect to illegal aliens,

>       at least where such action mirrors federal objectives
>       and furthers a legitimate state goal.

457 U.S. at 225.

Together, these cases "stand for the broad principle that 'state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress.'"  Toll, 458 U.S. at 12-13 (quoting De Canas, 424 U.S. at 358 n.6).  But, on the other hand, state laws enacted pursuant to congressional authorization – even if those laws impose unequal burdens on non-citizens – are subject to rational basis review.  See Soskin, 353 F.3d at 1254-55.

IV.   The Real I.D. Act.

Here, the State asserts that the DMV regulations and policies at issue are authorized by Congress and, therefore, subject to the more relaxed "rational basis" standard of review. Specifically, the State points to the provisions of the Real ID Act which, among other things, state that, "[b]eginning 3 years after the date of the enactment of this division [May 11, 2005],

a Federal Agency may not accept, for any official purpose, a driver's license or identification card issued by a State to any person unless the State is meeting the requirements of this section."  Pub. L. 109-13 Div. B, Title II, § 202(a)(1).  The Act goes on to provide that:

> To meet the requirements of this section, a State shall require, at a minimum, presentation and verification of the following information before issuing a driver's license or identification card to a person:
>
> (A)  A photo identity document, except that a non-photo identity document is acceptable if it includes both the person's full legal name and date of birth.
>
> (B)  Documentation showing the person's date of birth.
>
> (C)  Proof of the person's social security account number or verification that the person is not eligible for a social security account number.
>
> (D)  Documentation showing the person's name and address of principal residence.

Id. at § 202(c)(1).  Additionally, with regard to five categories of resident aliens, the Real ID Act provides that states may issue only temporary driver's licenses or temporary identification cards.  Id. at § 202(c)(2)(C).[5]

_____

[5]    The five categories of non-citizens to whom only temporary driver's licenses or identification cards may issue are: (1) holders of non-immigrant visas; (2) those with pending

To comply with the Act, states must also implement the following procedures:

> (A)   Before issuing a driver's license or identification card to a person, the State shall verify, with the issuing agency, the issuance, validity, and completeness of each document required to be presented by the person under paragraph (1) or (2).
>
> (B)   The State shall not accept any foreign document, other than an official passport, to satisfy a requirement of paragraph (1) or (2).

Id. at § 202(c)(3).  Finally, and perhaps most significantly for this litigation, the Act mandates that states establish "an effective procedure to confirm or verify a renewing applicant's information," id. at § 202(d)(4), and provide "fraudulent document recognition training programs for appropriate employees engaged in the issuance of driver's licenses and identification cards," id. at § 202(d)(9).

---

applications for asylum in the United States; (3) those with an application for temporary protected status in the U.S.; (4) those with approved deferred action status; and (5) those with a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the U.S.  Id. at § 202(c)(2)(B)(v)–(ix).

In summary, then, the Real ID Act was enacted to ensure that several states issue photographic identification cards only to people who are who they claim to be.  That is to say, the Act is concerned exclusively with preventing fraud in connection with the acquisition of state-issued identification cards.  It was not enacted to require (or even facilitate) a state's "investigation" into whether an applicant is, for example, wanted on criminal charges, appears on so-called terror "watch-lists," or even whether he or she is qualified to drive.  Accordingly, to be subject to the more lenient "rational basis" standard of review, the challenged practices of the State must be consistent with Congressional purpose and must fall within the scope of practices specifically contemplated by Congress and mandated by the Act relating to the prevention of identity fraud.

V.   <u>The State's Current Licensing Procedures</u>.

A.   Initial Licensing Exclusively in Concord.

As noted above, non-citizens seeking to obtain an original New Hampshire driver's license, as well as those seeking to renew an existing license that was issued prior to September 11, 2001, must appear at the DMV main office in Concord.  Once that license

34

(or renewal license) has issued, however, all subsequent renewals can be done at the applicant's local DMV substation.[6]

The State's justification for imposing this requirement is straightforward: in the wake of the September 11, 2001, attacks on the United States, and given the requirements of the Real ID Act, the State has a federal mandate, if not a legal obligation, to establish "an effective procedure to confirm or verify a renewing applicant's information," id. at § 202(d)(4), and to provide "fraudulent document recognition training programs for appropriate employees engaged in the issuance of driver's licenses and identification cards," id. at § 202(d)(9).  See also Id. at § 202(c)(3).  It is fair to presume that New Hampshire, and its citizens and residents, want the State's driver's license to be accepted as a reliable form of identification for federal purposes, such as airline travel, etc.  That, in turn, requires meeting the Real ID Act's mandates.

----

[6]     All driver's licenses issued prior to September of 2001, were valid for no more than four years and, therefore, they have now expired and, presumably, have already been renewed. Currently, then, only non-citizens applying for an original driver's license must appear at the DMV main office in Concord; non-citizen license renewals may now be processed at any one of the seventeen local DMV substations.

35

For non-citizens, the documentation submitted in support of
a license application includes passports issued by any one of
nearly 300 countries, as well as a myriad of legal status
documents issued by the Immigration and Naturalization Service.
To ensure that such documents are authentic, the State has hired
two document experts, who are stationed at the DMV main office in
Concord and who have been trained to recognize the numerous
documents that might be presented in support of a non-citizen's
license application as well as to recognize potentially
fraudulent documents.

Plainly, this system treats non-citizens differently.  But,
it is equally plain that the State's system is entirely
consistent with the requirements and objectives of the Real ID
Act.  The requirement that first-time applicants for New
Hampshire driver's licenses travel to the Concord DMV office is,
therefore, subject to "rational basis" review.  Moreover, the
State has articulated a rational and reasonable basis for
requiring first-time license applicants to appear in Concord.  In
other words, it has carried its burden of proving a "rational
relationship between the disparity of treatment and some

36

legitimate governmental purpose." <u>Bd. of Trustees v. Garrett</u>,
531 U.S. 356, 367 (2001).  <u>See also</u> <u>Kimel v. Florida Bd. of
Regents</u>, 528 U.S. 62, 84 (2000).

The State has a substantial interest in insuring that
driver's licenses are not obtained through the use of false or
fraudulent documentation.  To achieve that goal, the Real ID Act
imposes several fairly onerous requirements on the State to
insure that state-issued photographic identification cards are
not obtained through fraud or issued to persons not lawfully in
the country.  The number of different documents that non-citizens
may supply in support of an application for a driver's license
means that those charged with issuing the licenses must be
specially trained to recognize those documents and determine
their authenticity.  The State can fairly determine that the
human and financial resources necessary to place at least one
trained person at each DMV substation to recognize and verify the
authenticity of documents provided by non-citizens in support of
license applications are simply too burdensome, and that it is
more efficient and effective to organize review of non-citizen
documents in a central location.

While some of the practices employed by the DMV when plaintiffs originally filed this suit raise legitimate constitutional concerns, those practices have been substantially altered.  The current policies and practices employed by the State relating to the licensing of non-citizens (and re-licensing of non-citizens whose original licenses were issued prior to September 11, 2001), exclusively at the main DMV office in Concord do not violate plaintiffs' constitutional rights.  Because each plaintiff has already had one original or renewal license application processed at the main DMV office in Concord, each may now submit future renewal applications locally – in fact, four plaintiffs have already submitted renewal applications at their local DMV substation.  Accordingly, plaintiffs are not entitled to an injunction prohibiting the State from enforcing the provisions of Saf-C 1002.06(b) (requiring non-citizens to appear in Concord when they file an application for an original New Hampshire driver's license).

B.   Temporary Licenses.

Under the DMV's administrative regulations, once a non-citizen applicant for an original New Hampshire driver's license

submits an application and statutory fee, and satisfactorily
completes all appropriate testing, the applicant is issued a
temporary, 45-day, paper driving permit.  Saf-C 1003.04(e).
Plaintiffs also allege that, pursuant to an unwritten policy of
the DMV, some DMV employees have been issuing temporary driving
permits to non-citizens when they apply to renew an existing, but
expired, New Hampshire driver's license.  The temporary permit is
not laminated, nor does it include a photograph of the licensee.
United States citizens, on the other hand, receive a 6-month
temporary permit that is laminated and includes the licensee's
photograph.  See Saf-C 1003.03(c).  Given the increasing reliance
on state-issued photo identification cards (e.g., for airline
travel), plaintiffs complain that they are being unfairly (and
unconstitutionally) disadvantaged and discriminated against and,
in the process, are being denied an essential form of government-
issued identification.

     In response, the State says that it has made clear to all
DMV employees that temporary driving permits are not to be issued
to anyone who is merely renewing an expired New Hampshire
driver's license; only applicants for an original New Hampshire

driver's license are issued temporary driving permits, while their applications and supporting documents are being verified. The State also says it is in the process of renegotiating its contract with one of its suppliers so, in the future, the 45-day temporary permits will include a photograph of the permit holder.

As to its policy of issuing the 45-day paper driving permit to non-citizen applicants for original driver's licenses, while United States citizens are issued a 6-month laminated permit bearing a photograph of the holder, the State says its practice is justified by "compelling safety and security interests." Defendant's memorandum (document no. 11) at 11.  See also Exh. F to defendant's memorandum, Affidavit of William Haynes, Jr., at para. 11; Exh. G to defendant's memorandum, Affidavit of Arthur S. Garlow, at para. 16.  The State does not, however, explain how or why those "security concerns" are unique to non-citizens, nor does it explain why those concerns, whatever they might be, could not be adequately addressed if the State were simply to treat citizens and non-citizens alike and issue both groups the 6-month laminated permit bearing a photo identification.  Instead, the State asserts:

>       On non-U.S. citizen original applications, when the
>       non-citizen does not have a license from another state,
>       New Hampshire cannot check the non-citizen's driving
>       record to see if there are outstanding problems through
>       the problem driver pointer system ("PDPS") . . ..  It
>       is also not feasible to contact the non-citizens[']
>       home country for driving records.

Defendant's memorandum at 3.  Of course, the State faces the

identical problem when a citizen of the United States does not

hold a driver's license issued by another state.  Yet, the State

fails to articulate why its administrative regulations treat a

similarly situated citizen and non-citizen in such a disparate

manner.  Because the State has failed to articulate even a

rational basis for its classification with respect to issuing

temporary permits, and because the court cannot think of one,

plaintiffs are entitled to injunctive relief as to that limited

aspect of the challenged administrative regulations.


      These days, state-issued photographic identification cards

serve as a common currency of personal identification and have

become an increasingly essential part of day-to-day life.  Absent

even some rational justification for depriving (albeit

temporarily) resident non-citizens of that essential form of

identification, the State's current practice of issuing non-citizens a paper 45-day permit, while issuing citizens a 6-month laminated photo-I.D. permit, cannot stand.

   C.   Allegedly Unconstitutional "Unwritten Policies."

   Finally, plaintiffs challenge two allegedly unwritten policies of the DMV: (1) a requirement that non-citizens renew their New Hampshire driver's licenses more frequently than the statutory 5-year period; and (2) a requirement that non-citizens provide proof of residency when they are simply renewing an expired (but otherwise valid) New Hampshire driver's license. Some employees of the DMV might well have imposed one or both of the described unwritten policies on one or more of the plaintiffs prior to the filing of this suit, but the State has since remedied that situation.

   First, the State has made clear to all DMV employees that the expiration date of driver's licenses issued to non-citizens must be linked to the expiration date of the legal status documents provided by the applicant.  <u>See</u> Exh. C-1 to defendant's memorandum (document no. 40), "Clarification of the Pilot

42

Program" (April 27, 2005) ("Expiration dates of driver licenses will be tied to the expiration date of the legal status documents provided by the applicant."). So, for example, if a non-citizen applicant provides documentation demonstrating that he or she may lawfully remain in this country for, say, two years, his or her driver's license will expire at the end of that two-year period. That practice is specifically mandated by the Real ID Act. See id. at § 202(c)(2)(C)(ii).

Additionally, legislation was recently enacted to allow the DMV to pro-rate the $50 license fee, thereby allowing applicants who are eligible for licenses of fewer than 5 years to pay only a pro-rated portion of the 5-year statutory $50 fee (i.e., $10 for each year that the license is valid). See N.H. Rev. Stat. Ann. 263:42 I (effective January 1, 2006). That practice will also eliminate the issue of plaintiffs receiving "duplicate" licenses that bear the blue bar beneath their photographs – a circumstance that was the product of DMV employees' good faith efforts to assist non-citizens, by processing their license renewal applications in a way that implicated a much lower statutory fee than would otherwise apply.

43

With regard to plaintiffs' claim that some non-citizen applicants for renewal licenses have been required to comply with onerous requirements to demonstrate their residency, the State has addressed that issue as well.  As of at least April of 2005, the State has made clear to all DMV employees that, "[t]here is no requirement to prove residency upon renewal unless there is some reasons to believe the address has changed, such as a returned notice of renewal."  Exh. C-1 to defendant's memorandum, "Clarification of the Pilot Program."  That same rule applies equally to United States citizens seeking to renew their driver's licenses.

In light of the changes recently adopted by the State, plaintiffs are not entitled to injunctive relief with respect to those two allegedly unwritten "policies" of the DMV (expiration dates and proof of residency).

## Conclusion

When plaintiffs originally filed this suit, the State was engaged in several practices that were arguably questionable from a constitutional standpoint.  But, to its credit (and perhaps at

the urging of plaintiffs' counsel), the State recognized those
problems and addressed nearly all of them in ways that both
comply with constitutional requirements and protect the security
of its citizens by minimizing the opportunity for fraud in
connection with the acquisition of New Hampshire driver's
licenses.

     For the reasons discussed above, plaintiffs lack standing to
challenge Saf-C 1003.04(a)(3) (road skills test) and Saf-C
1003.04(c) (documentation from home country).  As to plaintiffs'
claims concerning Saf-C 1002.06(b) (requiring non-citizens to
file original license applications in Concord), as well as those
claims concerning the allegedly unwritten policies requiring non-
citizens to renew their licenses more frequently than citizens
and requiring them to provide more extensive documentation
demonstrating their New Hampshire residency, the State is
entitled to judgment as a matter of law.

     Although the most glaring flaws in the State's licensing
program have been remedied, the State continues to issue 45-day
temporary driver's permits to non-citizen applicants for original

driver's licenses, while it issues six month temporary licenses
to similarly situated United States citizens.  Because the State
has failed to offer sufficient justification for that
classification based upon citizenship status, and the concomitant
disparate treatment of non-citizens, plaintiffs are entitled to
injunctive relief to prohibit the enforcement of the offending
administrative regulation.

     Accordingly, plaintiffs' motion for preliminary and
permanent injunctive relief (document no. 4) is granted in part,
and denied in part.  It is granted to the extent that the
Commissioner of the New Hampshire Department of Safety is hereby
enjoined from enforcing the provisions of Saf-C 1003.04(e)
(issuance of a 45-day temporary driving permit to non-citizen
applicants).  In all other respects, however, plaintiffs' motion
is denied.

     The State's motion for partial dismissal (document no. 17)
is, for the reasons set forth in plaintiffs' opposition, denied.
The State's motion to exclude plaintiffs' expert (document no.
36) and its motion to strike (document no. 44) are denied as

moot.  Plaintiffs' motion for summary judgment (document no. 41) and the State's motion for summary judgment (document no. 40) are both granted in part, and denied in part, consistent with the terms of this order.  For the reasons set forth in defendant's memoranda, plaintiffs' claims based on alleged violations of their constitutional rights to due process and travel are denied.  See also Miller v. Reed, 176 F.3d 1202, 1205-06 (9th Cir. 1999).


The Clerk of the court shall enter judgment in accordance with this order and close the case.


        **SO ORDERED.**

                                    _____
                                    Steven J. McAuliffe
                                    Chief Judge

March 29, 2006

cc:  Christine C. Wellington, Esq.
     Melanie M. Chaput, Esq.
     Stephanie A. Bray, Esq.
     Nancy J. Smith, Esq.